FILED

09/23/2025

Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 13, 2025 Session

## STATE OF TENNESSEE v. ROBERT VERNON JOHNSON A/K/A ROBERT VERNON GRIFFIN

**Appeal from the Criminal Court for Davidson County
No. 2021-D-2113    Steve R. Dozier, Judge**

_____

### No. M2024-01398-CCA-R3-CD

_____

Defendant, Robert Vernon Johnson a/k/a Robert Vernon Griffin, was convicted by a Davidson County jury of second degree murder and possession of a firearm by a convicted felon. He received an effective sentence of thirty-one years' imprisonment. Defendant appeals, arguing that the evidence was insufficient to support his convictions and that the trial court abused its discretion in denying probation for the firearm conviction and ordering consecutive sentences. Upon review of the entire record, the briefs and oral arguments of the parties, and the applicable law, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

JILL BARTEE AYERS, J., delivered the opinion of the court, in which J. ROSS DYER and TOM GREENHOLTZ, JJ., joined.

Manuel B. Russ (on appeal), Nashville, Tennessee, and Anthony Q. Thompson and Michael Freeman (at trial), Nashville, Tennessee, for the appellant, Robert Vernon Johnson a.k.a. Robert Vernon Griffin.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Glenn Funk, District Attorney General; and Jeff George and J. Wesley King, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### Facts and Procedural Background

This case arose from the shooting death of Orlando Montez Hall by Defendant on July 21, 2021, in the parking lot of a Marathon gas station and market ("market"). The

events leading up to and including the shooting and its aftermath were captured on the market's surveillance cameras. Defendant admitted to shooting the victim but maintained that he acted in self-defense. For this conduct, the Davidson County Grand Jury returned a true bill charging Defendant with first degree premeditated murder (count one) and possession of a firearm by a person previously convicted of a violent felony (count two). At trial, the parties stipulated that Defendant had been previously convicted of attempted aggravated robbery, a violent felony.

Officers Anna Clayton and Jonathan Foote with the Metropolitan Nashville Police Department ("MNPD") were the first two officers to respond to the shooting. Both officers observed a woman attempting to perform CPR on the victim. To Officer Clayton, it was clear that the victim was "beyond help by the time that [she] got there." The victim was "bleeding profusely" and had obvious wounds to his head and neck. Officer Foote testified that "it was fairly obvious that the victim had suffered from a gunshot wound to the head." The dispatch for the shooting was made at 10:53 p.m. The victim was pronounced dead at the scene at 11:07 p.m.

Officer Foote was aware that the market had surveillance cameras and spoke with the clerk to review the footage. Officer Foote, along with MNPD Detective Ryan Russell and Detective Timothy Morgan, examined the footage to attempt to identify the shooter. After the victim was identified, his mother, Latasha Hall, was contacted and came to the market. Ms. Hall reviewed the surveillance footage and identified the shooter as Robert Griffin, someone who spent "a lot" of time with the victim.

Video footage from the market's surveillance cameras was played for the jury at trial; all of the footage lacked audio. The interior cameras showed that the victim entered the market at 10:47 p.m. Visible in his right pants pocket was the handle of a black gun. He purchased some items at the counter closest to the entrance and briefly turned his head when Defendant and a man later identified as Lavonte Coleman entered the market. The victim then left the store; no words were exchanged between the parties. Defendant was dressed in a black t-shirt and a black baseball cap bearing the words "billion dollar baby." He stood in line with Mr. Coleman to make a purchase after the victim left. Although not as obvious, visible in Defendant's right pants pocket was the end of the handle of a gun. Less than one minute later, the victim walked back into the market and waved at a shirtless man who was entering the market. The victim stood at the cash register behind a woman in front of Defendant and Mr. Coleman. The shirtless man stood to the right of Defendant as he talked to the victim. After completing a second purchase, the victim left the market. Defendant then said something to Mr. Coleman as he followed Defendant out. The victim held the door open for Defendant and the two began to talk.

- 2 -

A second video from inside the market showed that when the victim exited the market, Defendant lightly tapped Mr. Coleman twice on the back as he walked out behind the victim. Neither video showed a confrontation or conversation between the victim and Defendant inside the market.

The footage from the exterior camera faced the parking lot and the fuel pumps.[1] Because the victim backed his car into a parking space close to the front entrance of the market, the camera did not have a clear view of the driver side of the victim's car where the shooting occurred. Defendant backed his Nissan Titan truck into a parking space in front of the market. Defendant and the victim exited the market and walked causally to the driver side of the victim's car; the car blocked a view of the two men from the shoulders down. The victim's back faced the camera throughout the footage. He opened the door and bent down; Defendant walked to the victim's right and faced him with the car door between them. An enlarged clip of this footage showed that Defendant became more animated as he spoke to the victim and his head moved quickly from side to side. Defendant then moved to the victim's left and leaned into the victim. Then, suddenly, Defendant moved to his right, within the camera frame, and fired a gun into the victim's head and neck area. The victim collapsed immediately, no longer in the frame.

Defendant ran to his truck and waited for Mr. Coleman. After the gunshots, Mr. Coleman slowly exited the market and looked down where the victim had collapsed. He did not approach the victim but got inside the passenger side of Defendant's truck and the two drove off.

The wide-angle view of the surveillance footage showed at least seven people in the parking lot when Defendant shot the victim. Most of them left after the shooting; however, about two minutes after the shooting, a woman ran to the victim. While her actions were obscured by the victim's car, she appeared to be performing CPR on the victim as testified to by officers on the scene. While the woman rendered aid to the victim, an unidentified man dressed in a red jersey and red tennis shoes approached the victim's car. His specific actions could not be seen but he walked around the back of the car and emerged in view of the camera holding something down by his waist and concealing it in his jersey or right-hand side pants pocket. At trial, the parties appeared to acknowledge that the man in the red jersey had taken the victim's gun, as it was never recovered.

---

[1] The market had another exterior security camera but for reasons unknown, was not operational. The parties acknowledged that this camera, had it been working, would have provided an unobstructed view of the shooting based on its location.

MNPD crime scene investigators recovered a bullet projectile and three 9mm cartridge casings in and around the victim's car. One cartridge casing was lodged in the driver side front tire. The investigators explained that a cartridge casing will typically land closer to where the gun is fired, whereas a projectile could be found anywhere near the scene. The victim's car engine was idling, and blood splatter was observed on the interior of the driver side door. The victim was clutching two packs of unopened cigarillos and one bag of unopened Lifesaver gummies in his left hand when he was shot; he had nothing in his right hand.

Through social media, Officer Foote identified an address for Defendant's mother. In the early morning hours of July 22, 2021, Detective Ryan Russell, lead Detective Timothy Morgan, and a team of other officers went to Defendant's mother's apartment in Antioch to look for Defendant. Officers could see a man inside the apartment matching the description of Defendant's build. Defendant's mother initially denied that Defendant was there but finally admitted he was inside and consented to a search of her apartment. Defendant came out of the apartment without incident and was taken into custody. From the apartment, officers retrieved a black baseball cap with the words "billion dollar baby" on the front, a bill of sale, a motor vehicle registration, and car keys for a Nissan Titan truck. The documents showed Robert Griffin as the owner of the truck.

Defendant was transported to the police station. His mother and the two other people in the apartment at the time of the arrest also went to the station. Defendant waived his *Miranda*[2] rights and agreed to be interviewed by Detective Morgan and Sergeant Adam Reed. During his interview, which was recorded and played for the jury, Defendant identified himself as Robert Vernon Griffin.

Defendant stated that he and the victim, whom he referred to as "Hatch," grew up together, "never" had any issues, and always got along. He said his text messages and Facebook posts would verify this. He knew the victim's parents and was close to the victim's brother, Jerry Woodland, who was incarcerated. When Defendant saw the victim at the market, he wanted to talk to the victim about Mr. Woodland. For reasons not clear in the record, Defendant had been putting money into Mr. Woodland's jail account for his use while incarcerated and had recently given the victim's mother $60 to put in Mr. Woodland's account. According to Defendant, the victim had been spreading rumors that Defendant had not funded the victim's brother's account as promised.

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (holding any statement made by the accused during a custodial interrogation without the benefit of procedural safeguards is inadmissible in court).

Defendant testified that on the night of the shooting, he was in his truck in the market parking lot with Mr. Coleman when he saw the victim. He denied knowing the victim would be at the market. Defendant said he could see the victim's gun, "a nine or a forty" with an extended magazine, in the waistband of his pants as the victim entered the market. Defendant admitted that he was carrying a 9mm Glock which he purchased "off the street" for $300. He bought the gun "for protection" because he had been robbed multiple times.

Defendant and Mr. Coleman entered the market after the victim, greeted the victim at the cash register, and asked if they could talk. Defendant admitted that he was "buzzed" and said the victim "wasn't straight," suggesting that the victim was under the influence. Defendant asked the victim why he was spreading rumors that he had not put money into Mr. Woodland's account and said, "[I]f you look at the video, [the victim] had his hand on [his gun] from the jump."

Defendant again referred to the surveillance video and insisted that he was trying to keep the peace and prevent the interaction from escalating. He became fearful when he saw the victim put his hand on his gun because the victim "don't fight." He explained that the victim "don't know how to fight" and would rather use his gun than fight.

Defendant described the interaction with the victim as follows:

Sergeant Reed:    And it, was it in his, what, his right left, right?

Defendant:    Right waistband.

Sergeant Reed:    So it was in his right waistband?

Defendant:    Yep. And that's when he did like that, and that's when he came back. Just – I just . . .

Sergeant Reed:    So did he actually reach for it?

Defendant:    No, no. His hand was already on it.

Sergeant Reed:    His hand was on it?

Defendant:    Yes. From the, the time we had first talked. That's why I was going like, like if you see I'm going like that, "We ain't on that." And then he was just like, I said, "why is your hand on your [gun]?" I don't know

- 5 -

you can see it, you just look at the video. I was just like, "Why your hand on your gun, bro?" And he was just like, "You acting like uh" what did he say? "You act like you uh, uh bumping." He said, "You acting like you bumping down on me." That's the last words that came out of this mouth. And then he did something, and I was like . . .

Sergeant Reed: And he turned towards you with his hand on the gun? Did he ever take it out?

Defendant: I don't know. I didn't get that –

Sergeant Reed: Okay.

Defendant: (incomprehensible) like, I was already like under. I ain't going to lie, I was already under the influence.

Sergeant Reed: Okay.

In response to Detective Morgan's questioning, Defendant said he was trying to hit the victim with his gun but that "it just went off[.]" Defendant could not recall the number of times he fired his gun and said he did not realize the victim had been hit until the victim fell to the ground. Defendant denied that he shot the victim again when the victim fell to the ground after the first shot. Defendant fled the scene in his truck which he abandoned in the parking lot of an elementary school in East Nashville. He admitted that he "panicked" and dropped the gun "somewhere." Someone drove him to his mother's apartment in Antioch. He told his mother "a portion" of what had occurred. There was a man named Donald at his mother's apartment, and Defendant told Donald that the shooting had resulted from a "misunderstanding."

Defendant maintained that it was never his intention to shoot and kill the victim and that he had no reason to shoot the victim. He considered the victim "a threat" and accused him of making the situation "worse." He conceded that he had a criminal record but said it was "weak" and did not involve crimes of violence. He revealed that he and the victim had been charged together on a gun-related offense in 2013 when Defendant was driving the victim, his brother, and others. They were pulled over, and "they had guns" but no one claimed ownership of the guns. Defendant had just been released from a three-year sentence, and he was charged with reckless driving, instead of a gun-related offense.

After the recording of the interview was played to the jury, Detective Morgan explained that "bumping down" in street parlance was equivalent to getting in one's face or confronting someone physically. Detective Morgan testified that MNPD officers are issued the same type of gun used by Defendant, a semi-automatic 9mm Glock. He explained that it is possible to fire three shots in rapid succession with a semi-automatic gun but that each shot requires a trigger pull and cannot be discharged accidentally.

David Zimmerman, a forensic pathologist and medical examiner, performed the victim's autopsy and noted the victim's cause of death as gunshot wounds to the head and neck; the manner of death was homicide. The victim sustained three gunshot wounds to his head and neck. One projectile entered the victim's left cheek and exited the right side of his scalp. A second projectile entered the front of the victim's left ear and exited on the right side of the scalp. A third projectile entered the left side of the victim's neck just below the jaw and exited on the rear right side of the neck.

Dr. Zimmerman testified that it is generally difficult to determine the order in which bullets hit a body, as it was in the victim's case. The gunshot wound to the left cheek penetrated the skull and perforated several areas of the brain. Dr. Zimmerman testified that a wound of that magnitude would either incapacitate or "immediately kill" a person. Additionally, an injury to the brain causes a minor seizure, causing the muscles to contract such that if a gunshot victim is holding something in his hands, he is unlikely to let go of it. Dr. Zimmerman confirmed that it was unlikely that the victim would have been able to move after the shot to his left cheek.

Dr. Zimmerman explained that a contact range wound is a wound where the muzzle of the gun is pressed against the skin and a shot fired at close range would deposit gunpowder on the skin. He added, however, that a gun can be fired at close range without depositing gunpowder into the skin. Although no gunpowder stippling was observed on the wound to the victim's neck, a small laceration suggested that the gun was fired at contact range. Moreover, Dr. Zimmerman found a metal fragment and a piece of copper jacketing in the victim's hair.

A toxicology report showed that the victim had elements of heroin and fentanyl in his blood. Dr. Zimmerman denied that heroin contributed to the victim's death.

Defendant testified and admitted to shooting the victim but claimed he acted in self-defense. Defendant met the victim through the victim's brother, Jerry Woodland. Defendant was close to Mr. Woodland and had put money in Mr. Woodland's jail account. Before the shooting, Defendant testified that there was "no bad blood" between him and the victim. According to Defendant, the victim had wrongly accused Defendant of not funding Mr. Woodland's jail account.

Defendant testified that he drove Mr. Coleman to the market after helping a cousin move furniture. Mr. Coleman's mother was to pick him up at the market. Defendant denied knowing that the victim was inside when he pulled into the parking lot. Defendant said he went inside to purchase water and other items. His interaction with the victim inside the market was cordial. He agreed that when the victim left the market the second time, Defendant tapped Mr. Coleman on the back and followed the victim outside as depicted on the surveillance footage. Defendant denied, however, that he followed the victim out to confront him about the rumor that Defendant had not funded Mr. Woodland's jail account. Defendant testified that he "was already headed out the market anyway." By the time they exited the market, the parking space between the victim's car and Defendant's car was empty; Mr. Coleman's mother had left without Mr. Coleman.

Defendant testified that he asked the victim if they could talk. Defendant stated that the victim then "grabbed" or "brandished" his gun as they began talking outside. According to Defendant, the victim "seemed . . . impaired." Defendant testified that he stepped back from the victim and told him, "we wasn't on that." Defendant stated that he had "never known [the victim]" to resolve a conflict by fighting. Defendant testified that he tried to de-escalate the situation and referred to the portion in the surveillance footage where he was seen moving "back and forth with [the victim]." Defendant asserted that the victim was acting "aggressive" and that he feared for his safety.

Although he did not recall seeing the victim point his gun at him, Defendant testified that when the victim pulled out his gun, he believed the victim "was fixing to shoot." Defendant testified that he "reacted" and shot the victim. He maintained that he would be dead had he not shot the victim first. Defendant could not recall the number of times he pulled the trigger but denied that he shot the victim after the victim collapsed to the ground. After he shot the victim, Defendant ran to his truck and drove away. Defendant denied that he intended to kill the victim.

Defendant testified that he carried a gun "everywhere" for his safety although he was not supposed to carry one. He explained that he had been carjacked at the same market.

The jury convicted Defendant of the lesser-included offense of second degree murder, a Class A felony, in count one and possession of a firearm by a person previously convicted of a violent felony, a Class B felony, as charged in count two of the indictment. T.C.A. §§ 39-17-1307(b)(1)(A), -(b)(2).

At the sentencing hearing, the State introduced Defendant's presentence report. The victim's mother, Latasha Denise Hall, testified and described the victim as "a good person" who was close to his three brothers and two sisters. She was "stressed,

depressed, [cries] every day, and miss[es the victim] so much." She requested the maximum punishment. On cross-examination, Ms. Hall acknowledged that the victim carried a gun but did so only for his protection. She denied that he always carried a gun or that he had a drug problem.

Defendant's mother, Ingrid Gail Griffin, testified that she knew the victim and his mother. The victim and Defendant grew up together and spent time socially with each other as adults. On cross-examination, Ms. Griffin acknowledged that Defendant had "a problem with guns since he was [eighteen.]" Specifically, she confirmed that Defendant and "some other kids held a man up at gunpoint outside of his car and tried to rob him[.]" Ms. Griffin testified that she could not recall all the details of Defendant's plea in that case because she had recently suffered a stroke. However, she recalled that he pled to a reduced charge and received probation. She also recalled that while Defendant was on probation, he was "caught with a gun again." According to Ms. Griffin, Defendant was not reinstated to probation but "did time[.]" Ms. Griffin had not seen the surveillance videos of the shooting.

The victim's aunt, Quineetra Smith, testified that Defendant was "a good kid" but was faced with issues growing up in a neighborhood with "violence, drugs, gangs." Ms. Smith testified that she did not witness Defendant having any issues with the victim or acting violently toward anyone.

Mr. Coleman, Defendant's cousin, confirmed that he was in the market with Defendant on the night of the shooting. He testified that Defendant's interactions with the victim were "always friendly." He accused the victim of being someone who was "very easy to upset" and had a reputation for shooting people instead of fighting. A portion of the surveillance video from inside the market was played during his cross-examination testimony. He identified himself on the video standing in line behind the victim with Defendant. Mr. Coleman confirmed that it was Defendant who initiated the conversation with the victim.

Mr. Coleman said he was unaware Defendant had a gun. Mr. Coleman exited the market when he heard the gunshot. He testified that when he got outside, the victim was already dead on the ground with a drink in one hand and a gun in the other hand. Mr. Coleman stated that he was "in shock." He did not try to help the victim, call 911, or call the police to report the shooting. Defendant admitted to Mr. Coleman that he shot the victim. Mr. Coleman did not recall Defendant getting rid of the gun as they drove away from the market.

Defendant made an allocution apologizing to the victim's family. Defendant insisted that he acted out of fear and "reacted to the danger [he] perceived." He

maintained that he and the victim "had lost our self control" and that "if we had the time to listen, we could have compromised." He also faulted "everything that had been said to [the victim]" about the funding of his brother's jail account for "literally destroy[ing] us[.]"

Defendant also introduced a report by a forensic social worker and mitigation specialist who investigated Defendant's social history. The report detailed Defendant's turbulent upbringing and his criminal history, including an association with Pirus, a subset of the Bloods criminal organization.

In its argument, the State noted that Defendant had refused to take responsibility for his actions and had called on witnesses to blame the victim for the shooting, to badmouth the victim's character, and to trumpet Defendant's version of the shooting. The State highlighted Defendant's criminal history and noted the number of times his criminal charges had been reduced to lesser-included offenses. Significantly, although he was charged with attempted aggravated robbery, Defendant was given a reduced sentence on probation which he violated twice. The State added that Defendant had burglary and motor vehicle offenses reduced to reckless driving and possession with intent to sell or deliver reduced to simple possession. The State argued for consecutive alignment of the two sentences because Defendant was a dangerous offender.

Defense counsel argued that Defendant "regret[ted]" shooting the victim and that he was being "punished by his own conscience" and by being unable to see his family. Defense counsel requested concurrent sentences and that the trial court consider probation for the firearm conviction.

In a written order filed on June 27, 2024, the trial court applied two enhancement factors and no mitigating factors. The trial court found that Defendant had a history of criminal behavior in addition to those necessary to establish the range and that he employed a firearm during the commission of an offense. *See* T.C.A. § 40-35-114(1), (9). The trial court imposed a twenty-one-year sentence at 100% by operation of law for the second degree murder conviction and a ten-year sentence at 85% by operation of law for the felon in possession of a weapon conviction.

The trial court recognized that Defendant was statutorily eligible for probation for the firearm conviction because the convicted offense was not among the listed offenses ineligible for probation and the length of the sentence was ten years. T.C.A § 40-35-303(a)(1)(A)-(K). However, the trial court found that the principles of sentencing in Tennessee Code Annotated section 40-35-103 all mitigated against a sentence involving release into the community and denied Defendant's request for probation.

As for sentence alignment, the trial court found by a preponderance of the evidence that Defendant was a dangerous offender to warrant discretionary consecutive sentencing.

Following the trial court's denial of his motion for new trial, Defendant filed a timely notice of appeal.

**Analysis**

I.    Sufficiency of the Evidence

Defendant claims the evidence was insufficient to support both of his convictions. However, his brief focuses entirely on his second degree murder conviction and the jury's rejection of his self-defense claim. Thus, he has waived any claim regarding his firearm conviction. *Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012) ("An issue may be deemed waived, even when it has been specifically raised as an issue, when the brief fails to include an argument satisfying the requirements of Tenn. R. App. P. 27(a)(7).").[3] The State contends the evidence was sufficient to support the jury's rejection of Defendant's claim of self-defense. We agree with the State.

When a defendant challenges the sufficiency of the evidence, this court is obliged to review that claim according to certain well-settled principles. "A guilty verdict 'removes the presumption of innocence and replaces it with a presumption of guilt.'" *State v. Reynolds*, 635 S.W.3d 893, 914 (Tenn. 2021) (quoting *State v. Gentry*, 538 S.W.3d 413, 420 (Tenn. 2017)); *State v. Allison*, 618 S.W.3d 24, 33 (Tenn. 2021). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *Allison*, 618 S.W.3d at 33; *State v. Jones*, 589 S.W.3d 747, 760 (Tenn. 2019). The relevant question the reviewing court must answer is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Allison*, 618 S.W.3d at 33-34 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also* Tenn. R. App. P. 13(e).

On appeal, "all reasonable and legitimate inferences from the evidence must be drawn in favor of the prosecution and all countervailing evidence discarded." *State v. Weems*, 619 S.W.3d 208, 221 (Tenn. 2021); *State v. Rimmel*, 710 S.W.3d 640, 645 (Tenn.

---

[3] Waiver notwithstanding, the evidence is sufficient to support the conviction in count two. Defendant admitted to shooting the victim with a firearm and he stipulated that he had a prior conviction for a violent felony thus satisfying the elements under the statute. T.C.A. 39-17-1307(b)(1)(A).

2025). As such, this court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017). Questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *Rimmel*, 710 S.W.3d at 645; *Allison*, 618 S.W.3d at 34; *Jones*, 589 S.W.3d at 760. "This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

Second degree murder is a "knowing killing of another." T.C.A. § 39-13-210(a)(1). A person acts knowingly "with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]" *Id.* § 39-11-106(a)(23). "To sustain a finding that a defendant acted knowingly, the State is not required to prove that the defendant wished to cause his victim's death but only that the defendant knew that his or her actions were reasonably certain to cause the victim's death." *State v. Brown*, 311 S.W.3d 422, 432 (Tenn. 2010). In assessing the defendant's intent, the jury may rely on "the character of the assault, the nature of the act and [on] all the circumstances of the case in evidence." *State v. Inlow*, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000) (citing *State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)). Whether a defendant acted "knowingly" in killing another is a question of fact to be addressed by the jury. *Brown*, 311 S.W.3d at 432 (citations omitted).

While he admits to shooting the victim with a weapon he was prohibited from possessing, Defendant claims he did so in self-defense. He argues that the State failed to show that "no reasonable jury could have found self-defense[.]" By their verdict, the jury found that Defendant acted knowingly when he aimed and fired a deadly weapon into the victim's head and neck. The autopsy revealed that the victim was shot three times. Defendant used a weapon that required him to release and pull the trigger for each subsequent shot. Defendant's act of aiming and firing two more times at the victim supported the inference that he was aware of the fatal consequences of his action. Absent legal justification, Defendant's act of knowingly killing the victim was supported by the evidence.

Defendant asserts that he was legally justified in shooting the victim because he was acting in self-defense. Because Defendant used deadly force, this court is guided by Tennessee Code Annotated section 39-11-611(b)(2) which provides justification to use lethal force as follows:

Notwithstanding § 39-17-1322,[4] a person who is not engaged in conduct that would constitute a felony or Class A misdemeanor and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

T.C.A § 39-11-611(b)(2) (2021).

A defendant's conduct and mental state must meet an objective standard of reasonableness for the conduct to be justified under this statutory defense. *State v. Bult*, 989 S.W.2d 730, 732 (Tenn. Crim. App. 1998). "Thus, the mere fact that the defendant believes that his conduct is justified would not suffice to justify his conduct." *Id.* "Reliance on self-defense is not limited to the exact moment of the assault that may be considered in connection with the entirety of the events leading to the assault." *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993) (citation omitted). "If proven to the satisfaction of the jury, self-defense is a complete defense to crimes of violence." *Id.* at 727 (citations omitted).

To prevail on judicial review, Defendant must show that as a matter of law, the proof of self-defense raises a reasonable doubt as to his conduct being criminal. *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); *see State v. Benson*, 600 S.W.3d 896, 907 (Tenn. 2020) (agreeing with the trial court that there was no proof to permit a jury to conclude that the defendant had reasonable grounds to fear imminent bodily injury or death where the defendant responded to a punch in the nose by shooting a small, unarmed woman five times including twice in the back).

Under the facts of this case, the proof supports the jury's conclusion that it was unreasonable for Defendant to believe deadly force was immediately necessary to protect him from the victim. While the video of the shooting does not show the victim's arms and hands, it does show that the position of the victim's shoulders was inconsistent with

---

[4] Tennessee Code Annotated section 39-17-1322 provides a defense for weapons violations when a person uses a handgun in justifiable defense.

any action of his brandishing or withdrawing his gun. The victim collapsed immediately from the first gunshot. The medical examiner testified that the brain injury the victim suffered would have either incapacitated or immediately killed the victim. The additional shots fired by Defendant were an unreasonable use of force on someone who simply possessed a gun but otherwise showed no act of threatening or harming Defendant. *State v. Perrier*, 536 S.W.3d 388, 404-05 (Tenn. 2017) (holding harmless jury instruction on self-defense where "no reasonable person" could find that the defendant should fear imminent bodily injury or death where only words were exchanged and no one had used or attempted to use unlawful force on the defendant in a convenience store shooting); *State v. Gaines*, No. M2023-01389-CCA-R3-CD, 2025 WL 1514049, at *6 (Tenn. Crim. App. May 28, 2025) (finding no error in trial court's refusal to give self-defense instruction where under de novo review, this court found that it was "unreasonable for the Defendant to use deadly force in a public place against the unarmed and oblivious victim merely because the victim had a hand inside his clothing and happened to be in proximity to someone else the Defendant feared and considered to be a threat"), *perm. app. filed* (Tenn. July 29, 2025).

Accordingly, we conclude that the evidence is sufficient for the jury to find a knowing killing beyond a reasonable doubt. Nor has Defendant shown that the proof of self-defense raises, as a matter of law, a reasonable doubt as to his conduct being criminal.

## II.     Sentencing

Defendant complains that the trial court abused its discretion by running his sentences consecutively and by denying his request for probation for count two. The State contends that the manner and alignment of the sentences are presumptively reasonable. We agree with the State.

This court reviews a trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). This presumption applies to "within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.* This standard of review applies to decisions involving alternative sentencing and to consecutive sentencing decisions. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013).

A trial court's proper application of the purposes and principles of sentencing is demonstrated in the trial court's findings. To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. T.C.A. § 40-35-210(e); *Bise*, 380 S.W.3d at 706. "Mere

inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]." *Bise*, 380 S.W.3d at 705-06.

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant made on the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the pre-sentence report. *See* T.C.A. §§ 40-35-102, -103, -210(b); *see also Bise*, 380 S.W.3d at 697-98. The trial court must also consider a defendant's potential or lack of potential for rehabilitation or treatment. *See* T.C.A. § 40-35-103(5). The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts.

## A. Denial of Probation – Count Two

When imposing a sentence of confinement, the trial court should consider whether:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(A)-(C).

"Probation is a privilege or act of grace which may be granted to a defendant who is eligible and worthy of this largesse of the law." *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000). As such, a defendant bears the burden of proving his suitability for this "largesse." *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008) (citing T.C.A. § 40-35-303(b)). "This burden includes demonstrating that probation will 'subserve the ends of

justice and the best interest of both the public and the defendant.'" *Id.* (quoting *State v. Housewright*, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)). To determine whether a defendant has met this burden, trial courts are to consider "(1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; and (6) special and general deterrence value." *State v. Trent*, 533 S.W.3d 282, 291 (Tenn. 2017).

Defendant contends that the record does not support the denial of probation under the principles of sentencing as set forth in Tennessee Code Annotated section 40-35-103(1). He argues that 1) his one failure to abide by conditions of a release into the community – a probation violation for a 2011 conviction – was neither recent nor numerous; 2) incarceration did not justify or support deterrence; and 3) he lacks a "long history of criminal conduct."

In denying probation, the trial court made the following findings:

> Defendant has a lengthy history of criminal conduct, including the repeated appearance of firearms. The ongoing plague of gun violence robs the citizenry of peace of mind, sense of safety, and lives lost to death or incarceration. The Court cannot emphasize enough the seriousness of this type of offense and declines to depreciate the deterrent effect by releasing Defendant onto any type of supervised probation. Referenced during the sentencing hearing and through an exhibited judgment form for [simple possession].[5] Defendant appears to have violated his probation in the past. The STRONG-R risk and needs assessment classifies Defendant at an overall moderate risk level. Thus, having considered the above factors and the overall purposes of sentencing, the Court declines to grant alternative sentencing for Count [two].

We find no error in the trial court's judgment in its denial of probation. In 2011, Defendant pled guilty to attempted aggravated robbery and received a three-year sentence of probation along with the dismissal of two additional counts. Yet, while on probation, he committed a new offense, felon in possession of a firearm in 2013, resulting in the violation of his probation. The fact that he stands convicted of the same offense – convicted felon in possession of a firearm – in this case demonstrates his unwillingness to abide by the conditions of an alternative sentence and supports the trial court's finding that Defendant is not entitled to the "largesse" of probation.

---

[5] The judgment form indicates that the eleven-year, twenty-nine-day sentence was to be served concurrently to a sentence for "P.V.", probation violation.

Contrary to his assertion, Defendant has a history of criminal conduct. In addition to the convictions for attempted aggravated robbery and felon in possession of a deadly weapon, Defendant's criminal history included convictions for evading arrest, criminal trespass, a drug-related offense, reckless driving, and driving on a revoked license. He also had additional charges that were either dismissed or retired. Not in the presentence report but reported by the mitigation specialist was Defendant's involvement in a subset of the Bloods, a criminal organization. Defendant's history of criminal conduct, which is not limited to convictions, also supports the trial court's denial of probation.

Accordingly, the trial court's judgment in ordering confinement for Defendant's within-range sentence in count two, was presumptively reasonable and not an abuse of discretion. *Caudle*, 388 S.W.3d at 278-79.

## B.    Consecutive Sentencing

The presumption of reasonableness applies where a trial court "properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review[.]" *Pollard*, 432 S.W.3d at 862. This means that the reviewing court will give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *Id.* at 861.

As relevant to this case, the trial court may order sentences to run consecutively if it finds by a preponderance of the evidence that a defendant is "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high[.]" T.C.A. § 40-35-115(b)(4). Before a trial court may impose consecutive sentences on the basis that a defendant is a dangerous offender, the trial court must find that consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct. *State v. Wilkerson*, 905 S.W.2d 933, 937-39 (Tenn. 1995). "The adoption of the abuse of discretion standard with the presumption of reasonableness has not eliminated this requirement." *Pollard*, 432 S.W.3d at 863. To limit the use of the "dangerous offender" category to cases where it is warranted, the trial court must make specific findings about "particular facts" which show that the *Wilkerson* factors apply to the defendant. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

When imposing consecutive sentences, the trial court must also consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which

the sentence is imposed." T.C.A. §§ 40-35-102(1), -103(2), -103(4); *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002).

Defendant contends that the trial court's findings under *Wilkerson* are inadequate and erroneous because the trial court cited both the dangerous offender factor and the extensive criminal activity factors in its analysis. T.C.A. § 40-35-115(b)(2), (4). In its consideration of whether the severity of the offenses justified consecutive sentencing, the trial court drew upon the facts of the case:

> First, the Court finds that consecutive sentencing reasonably relates to the severity of the offenses. One victim was robbed of his life and patrons were placed in grave danger due to Defendant's actions. Absent consecutive sentencing, Defendant's sentence for possessing a firearm where he has been previously convicted of a felony crime of violence would effectively be moot, as it would be subsumed into the class A felony sentence.

Additionally, the proof at trial supported the trial court's determination that Defendant was a dangerous offender as contemplated by the statute and that the imposition of consecutive sentences was reasonably related to the severity of the offenses. Defendant fired a loaded weapon three times at the victim in the parking lot of a busy gas station and market; surveillance video showed at least seven people nearby when he fired the shots. His actions not only resulted in the victim's death but also created a high risk of death or serious bodily injury to the other patrons seen fleeing to avoid getting shot. Such behavior showed little or no regard for human life and involved a high risk to life.

Reflecting on whether consecutive sentencing was necessary to protect the public against further criminal conduct by Defendant, the trial court examined Defendant's criminal history:

> Second, the Court finds that consecutive sentencing is "necessary to protect the public against further criminal conduct by the defendant." The Court is deeply concerned with the continuation of Defendant's violent felonies. Given Defendant's apparent disregard for the value of human life, and willingness to employ firearms, the Court is of the opinion Defendant should be incarcerated and separated from society. Therefore, consecutive sentencing is necessary to protect the public from further criminal conduct by Defendant.

Defendant's record showed continuous criminal behavior that progressed to more violent offenses. The shooting in this case was violent and severe. In addition, Defendant's decision to arm himself with a gun in violation of his status as a convicted felon showed a wanton disregard of the law and a risk of continued criminal conduct. Moreover, the record displayed few, if any, signs of rehabilitation or improvement.

Finally, the trial court considered the principles of sentencing:

> Next, the Court finds that consecutive sentencing is consistent with the "general principles of sentencing." The Court recognizes that Defendant has been convicted of offenses involving weapons and violence, including an attempted aggravated robbery. As the Court previously noted, these past convictions dovetailed with the present criminal matter to a fatal result. Also, Defendant's commission of a homicide in conjunction with being a convicted violent felon in possession of a weapon warrants the Court to recognize serious and separate crimes through consecutive sentencing.
>
> Lastly, the Court finds that the purposes of sentencing are served where the requirement of consecutive sentencing provides an effective deterrent. The Court is concerned that fully concurrent sentencing provides no deterrent effect where two distinct serious crimes were committed. Accordingly, the Court finds that all these factors support consecutive sentencing by a preponderance of the evidence.

(internal citations omitted).

We observe no error or inadequacy in the trial court's analysis or findings. The trial court made the requisite *Wilkerson* findings and cited specific facts to support the imposition of consecutive sentences. Defendant is not entitled to relief.

## Conclusion

For the foregoing reasons, the judgments of the trial court are affirmed.

s/*Jill Bartee Ayers*
JILL BARTEE AYERS, JUDGE